# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| CHERYL SKELTON; } | |
| COMENECIA JAMES, } | |
| } | |
| Plaintiffs, } | |
| } | **CASE NO. CV 03-B-2242-W** |
| vs. } | |
| } | |
| LOUIS DANIEL BOISOT, } | |
| individually and in his official } | |
| capacity as Director of Tuscaloosa } | |
| County Community Corrections; } | |
| TUSCALOOSA COUNTY, } | |
| ALABAMA, } | |
| } | |
| Defendants. } | |

## MEMORANDUM OPINION

Currently before the court are separate Motions for Summary Judgment filed by

defendants Tuscaloosa County, Alabama (Doc. 61),[1] and Louis Daniel Boisot (Doc. 64).

Plaintiffs Cheryl Skelton and Comenecia James, employees of Tuscaloosa County, filed this

action pursuant to Title VII of the Civil Rights Act of 1964, the Equal Protection Clause of

the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983. (Doc.

1 ¶¶ 43-55.) Plaintiffs also brought various tort claims under Alabama law. (*Id.* ¶¶ 56-81.)

Upon consideration of the record, the submissions of the parties, the arguments of counsel,

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document
as it is filed in the court's record.

and the relevant law, the court is of the opinion that defendants' Motions for Summary Judgment are due to be granted.

## I.  FACTUAL SUMMARY

Defendant Tuscaloosa County operates the Tuscaloosa County Community Corrections program ("TCCC").  This program works in conjunction with the municipal, district, and circuit courts of Tuscaloosa County to offer a variety of program alternatives for individuals charged with or convicted of offenses and ordered to TCCC's supervision by those courts.  (Doc. 65, Ex. A ¶ 4.)  TCCC controls the county's alternative/pre-trial sentencing, electronic monitoring, drug court supervision, community service, and drug testing.  (*Id.*)  Defendant Boisot was hired as the Director of the TCCC on July 28, 2001.  (*Id.* ¶ 2.)  As director, Boisot supervises both plaintiffs in this case.  (Doc. 1, ¶¶ 4, 6.)

### A.    Plaintiff Cheryl Skelton

Skelton was hired on August 1, 2001, by Tuscaloosa County as a court referral officer. (Doc. 62, Ex. B at 13.)  She also serves as a case manager for the county's electronic monitoring program and on occasion, when Boisot is absent, as acting director of TCCC.  (*Id.* at 17, 35.)  On one such occasion in May of 2003, a TCCC employee named Misti Lake came to Skelton and told her that Boisot was making another employee named Ramona Nelson[2] uncomfortable by shutting his office door while he met with Nelson.  (*Id.* at 34-35.)  Around

---

[2] Nelson was originally a plaintiff in this action.  However, the court granted her Motion for Voluntary Dismissal of all of her claims, with prejudice, against defendants on March 30, 2004. (Doc. 19.)

that time, Michelle Williams, also a TCCC employee, told Skelton a similar story about Boisot and Nelson. (*Id.* at 36-37.) Nelson asked Skelton for her help in keeping her from having to return to Boisot's office in the future. (*Id.* at 37.)

Because Skelton received Nelson's complaint while she was acting as director, she contacted her personal lawyer to ask whether she should report what she had learned. (*Id.* at 224-25.) Skelton's attorney apprised Robert Spence, the County Attorney for Tuscaloosa County, of the complaint, and Spence had Lieutenant Byron Waid investigate the matter. (*Id.* at 225-27; Doc. 77, Ex. A at 15-17.) Lieutenant Waid interviewed Skelton during the course of this investigation. During that interview, Skelton stated that Boisot had not specifically harassed her. (Doc. 62, Ex. B, ex. 2 at D00087.)

Skelton now bases her claims on several incidents between her and Boisot. First, she states that Boisot invited her to see his house when she was working in the area. (Doc. 62, Ex. B at 142.) She alleges that on this occasion he told her that his wife would be working late. (Doc. 62, Ex. B, ex. c at 2.) On another occasion Boisot said to Skelton that he was ordering her to come see his house and that if she did not go, there would be repercussions. (*Id.* at 143.) She did not go to his house on either occasion, and he said nothing further about her coming to his house. (*Id.*)

Skelton also alleges that Boisot harassed her by twice inviting her on business trips to Florida. Boisot first asked her to accompany him on a site visit to the plant of a company that worked with the county's electronic monitoring program. (*Id.* at 39-40.) Skelton was

3

aware that a local judge would also be going on the trip, as well as Boisot and the judge's wives.  (*Id.* at 40-42.)[3]  Skelton did not go on this trip because, she testified, it was only necessary to be there on Friday, but Boisot planned to leave on Thursday and return on Sunday.  (*Id.* at 40, 42-43.)  Later, Boisot again asked Skelton to visit the vendor for the electronic monitoring program because judges had been asking questions about the program, and Boisot "felt like it would be important for us to get more information about the . . . equipment [they] were using." (*Id.* at 44.) Skelton arranged to have herself put on a different flight and in a different hotel from Boisot, but she later created a story about her son's prom to give her an excuse not to go, and ultimately neither she nor Boisot went to Florida on this occasion.  (*Id.* at 43-46.) During her employment, Skelton traveled once with Boisot and two other employees; she had no problems with him on that trip.  (*Id.* at 47-48.)

Skelton further alleges that Boisot made sexually inappropriate remarks to her in the workplace.  She described these statements as "hit and run," in that he would make the statement and then leave the room before Skelton could react.  (*Id.* at 80.)  Boisot's comments included his stating that if Skelton were not married, she would be interested in

---

[3]  Skelton testified as follows at her deposition:

> Q.   (by Mr. Vreeland) Do you know if [Boisot] had asked anyone else to go with him?
> A.   I understood, after talking to the man at Pompano Beach, that their wives were invited.  But I was never told that my husband could go.
> Q.   You understood that Mr. Boisot and Judge Malone's wives were invited?
> A.   According to the man down in Pompano Beach, Dan Zimmerman.

(Doc. 62, Ex. B at 41-42.)

him; his asking her if she was dressing for him because what she was wearing was "really nice;" and his making a "big deal" out of blue outfits because that was his favorite color. (*Id.*)  Skelton would typically respond to these types of comments with a "thank you," and she never told Boisot that such comments made her feel uncomfortable.  (*Id.* at 203.)  Boisot also commented about Skelton's husband, saying that she was "marrying a baby and not a man."  (*Id.* at 80.)  On one occasion when Skelton was sitting in the office of a younger co-worker named Jason, Boisot remarked that he knew that Skelton liked younger men because she was always in Jason's office.  (*Id.* at 81.)  Additionally, when two employees were looking at a swimsuit catalog in the office, Boisot picked out swimsuits that he thought would look good on the female employees.  (*Id.*)  Skelton also complains that Boisot would look at her in an inappropriate manner: "[j]ust general looks," "[t]he up-and-down look, looking at [her] breasts."  (*Id.* at 90, 94.)  Finally, she alleges that he made her uncomfortable by closing the door to his office when they spoke, although he never acted inappropriately while the door was shut.  (*Id.* at 90.)

## B.    Plaintiff Comenecia James

James was hired in January of 2000 as an administrative assistant to Wilford Moss, who was then the Director of TCCC.  (Doc. 62, Ex. C at 11.)  She was certified as a court referral officer in 2001 and oversaw the electronic monitoring program until Skelton was hired.  (*Id.* at 11-12.)  Moss died in April of 2001 and Boisot was hired as his replacement. (*Id.* at 11, 114.)  While James oversaw electronic monitoring, she worked in the main

Tuscaloosa office. (*Id.* at 13.)  After she became a court referral officer, she stayed at the

main office for a short while and then was transferred to the Northport office in September

of 2002.[4] (*Id.* at 14.)

James alleges that, before she was transferred, Boisot harassed her by inappropriately

touching her on several occasions.  One instance occurred when she was having knee

problems and could barely walk. (*Id.* at 37.)  Boisot told her that he had also had knee

problems, and touched her swollen knee and compared it to the less swollen knee. (*Id.* at 40.)

James testified that she viewed the touching as sexual, (*Id.* at 41), though she also said the

touching was similar to what a doctor would do, (*Id.* at 147-48), and that Boisot made no

sexual comments while touching her knee (*Id.* at 42).

James also asserts that Boisot harassed her by briefly rubbing her shoulders on several

occasions after she told him that she was tired. (*Id.* at 43-44.)  She  testified that the shoulder

rubbing lasted about ten seconds and was similar to a massage. (*Id.* at 44-45.)  These

massages happened more than once or twice but less than ten times. (*Id.* at 45.)  Boisot made

no sexual comments while rubbing her shoulders, and James never told him not to touch her

shoulders. (*Id.* at 46-47.)

Finally, James complains that Boisot hugged her on the day she moved from the main

TCCC office location to the Northport office. (*Id.* 47-48.)  She testified that it was not

merely a friendly hug because he accompanied the hug with comments such as "I'm going

---

[4] As Boisot works at the main office, James no longer worked around him after September 2002.

to really miss you" and "You call me if you need anything." (*Id.* at 48.)  This hug lasted ten to fifteen seconds and then Boisot walked away "kind of teary-eyed," according to James. (*Id.*)  James said that she did not feel physically threatened by Boisot.  (*Id.* at 148-49.)

In addition to this alleged physical harassment, James also alleges that Boisot made sexually harassing comments to her while she worked with him in the main TCCC office. She states that she occasionally had panic attacks and would pat herself on the chest to calm down.  (*Id.* at 51-52.)  On two occasions, Boisot saw her patting her chest and said, referring to her breasts, "don't beat those things . . . because they're much too precious."  (*Id.* at 52.) He also commented about how nice she looked on a regular basis, as well as making the same comments to James when she wore blue, his favorite color, as he did to Skelton.  (*Id.* at 54.) James further asserts that Boisot asked her personal questions about her future family plans and the type of man she preferred; when she told him that those questions had "nothing to do with [her] job," he stopped asking her such questions.  (*Id.* at 56, 145.)  Finally, on one day when James "was just wanting everybody to leave [her] alone," Boisot asked her if she was "on the rag."  (*Id.* at 58.)

## C.   Plaintiffs' Response to the Alleged Harassment

In May of 2003, plaintiff Skelton and former plaintiff Nelson brought their allegations of sexual harassment to Skelton's attorney and, ultimately, to Tuscaloosa County officials. (Doc. 62, Ex. B at 223-28.)  Nelson complained that Boisot had sexually harassed her both verbally and physically.  (Doc. 1 ¶¶ 19-28.)  Boisot learned of their allegations about one

month before the Complaint was filed on August 11, 2003. (Doc. 76 at 8; Doc. 77, Ex. B at 41.) A few weeks after learning of his subordinates' allegations, on July 28, 2003, Boisot issued a memorandum in which he directed changes in job assignments and office locations for James, Nelson, and Skelton, as well as TCCC employee Shenoria McKinstry. (Doc. 62, Ex. B, ex. 4.) After these changes were announced, James for the first time complained of harassment by Boisot. (Doc. 62, Ex. C at 73-74.) The reassignments, according to the memorandum, were in response to employee Kimberly Wiley's plans to leave her position at TCCC. (*Id.* at 1.) This memorandum and the reassignments therein were rescinded two days later, on July 30, 2003, when Wiley withdrew her resignation from TCCC. (Doc. 62, Ex. B, ex. 5.)

On August 7, 2003, Boisot sued the three original plaintiffs, as well as Skelton's husband, in the Circuit Court of Tuscaloosa County. Boisot claimed that those defendants had defamed him by making false claims of sexual harassment and sought damages. (*Boisot v. Nelson*, CV-03-C-2303-W, Doc. 1, Ex. A at 203 (N.D. Ala.).) That case was removed to the United States District Court for the Northern District of Alabama, consolidated with the present action (*Id.* Doc. 8), and dismissed in April 2004 pursuant to Boisot's motion to dismiss all claims without prejudice (Doc. 25). Plaintiffs filed their complaint in the present case on August 11, 2003. (Doc. 1.)

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.  *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.  DISCUSSION

As a preliminary matter, the court must determine the relevance of the claims of former plaintiff Ramona Nelson to its consideration of the claims of the remaining plaintiffs. Plaintiffs argue that Nelson's allegations are relevant; defendants contend they are not.  To support their argument, plaintiffs assert that "Skelton was present when the incident occurred, and has first-hand knowledge of much of what happened."[5]  (Doc. 76 at 14.)

Plaintiffs' only evidentiary support for this argument is a transcript of Lieutenant Waid's interview with Skelton, which they claim "details . . . the Nelson incident."  (*Id.* at 9 (citing Doc. 62, Ex. B, ex. 2 at D00081-91.)  A review of this transcript reveals that the extent of Skelton's first-hand knowledge of any of Boisot's conduct regarding Nelson is that she heard him lock his door to speak with Nelson on two occasions.  (Doc. 62, Ex. B, ex. 2 at D00083, D00085.)  Skelton testified that she never saw him act inappropriately toward Nelson.  (Doc. 62, Ex. B at 113-14.)  She also testified that she heard Boisot state, during a cell phone conversation with Nelson, that he wanted Nelson to meet him for a trip to Montgomery, and that she never heard him say anything else inappropriate to either Nelson or James.  (*Id.* at 114-15, 17.)

Plaintiffs correctly argue that one can be subjected to sexual harassment without personally being harassed.  *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995) ("A plaintiff may have a viable hostile environment claim even if the . . . remarks

---

[5]  The "incident" is apparently a reference to an alleged sexual assault of Nelson by Boisot detailed in the Complaint.  (Doc. 1 ¶¶ 24-27.)

are not directed at her."). However, Skelton's actual first-hand knowledge of harassment by Nelson is extremely limited.[6] When viewed in its entirety, she clearly was not exposed to a level of conduct that could have "contributed to her subjective view of a hostile environment." *Id.*

Everything that Skelton had heard about Boisot's actions came from Nelson's statements to her. For instance, as plaintiffs allege in their statement of material facts: "Skelton later learned from Nelson that Boisot had asked Nelson for oral sex and other details of his attempt to obtain sexual favors. She also learned [from Nelson] about Boisot's invitation to Nelson to accompany him to Montgomery and his numerous telephone calls to Nelson at her home." (Doc. 76 at 9.) Lieutenant Wade asked Skelton whether "all this information about Ramona is things [sic] she told you occurred?" (Doc. 62, Ex. B, ex. 2 at D00088.) Skelton said that that was indeed the case. (*Id.*) These communications from Nelson to Skelton clearly constitute inadmissible hearsay, and as such will not be considered in addressing defendants' summary judgment motions. *See Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir. 2004).

Furthermore, plaintiffs note that Skelton first learned of Nelson's allegations when she received the complaints in her capacity as acting director of TCCC. (Doc. 76 at 9 (citing Doc. 62, Ex. B at 224); Doc. 62, Ex. B, ex. 2 at D00083 ("Even though [Nelson] may have

---

[6] Plaintiffs do not argue that James had first-hand knowledge of Boisot's alleged harassment of Nelson. The alleged "incident" took place on May 9, 2003 (Doc. 1 ¶ 24); at that time James no longer worked in the same office of TCCC as Nelson and Boisot. (Doc. 62, Ex. C at 14.)

come to me as a friend, I was acting director at the time.").)  Based upon these reports, Skelton set in motion the county's investigation of Boisot.  (Doc. 62, Ex. B at 13.)  An employee's complaint to a supervisor cannot itself create a harassment claim for the complained-to supervisor against the alleged harasser.

Because Skelton's actual knowledge of Boisot's allegedly harassing treatment was extremely limited, and the remainder of her testimony was inadmissible hearsay reported to her in her capacity as acting director, Nelson's allegations cannot support plaintiffs' own claim of sexual harassment.  Plaintiffs must rely on their own allegations of harassment to establish their claims.

## A.      Plaintiffs' Sexual Harassment Claims

To prevail against defendant Tuscaloosa County on their claim for hostile environment sexual harassment under Title VII, plaintiffs must satisfy the following five requirements: (1) they belonged to a protected group; (2) they were subjected to unwelcome sexual harassment; (3) the harassment was based upon their gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatorily abusive environment; and (5) a basis for holding the employer liable exists.  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).

### 1.      Plaintiff Cheryl Skelton

In the present case, Skelton's allegations do not approach the necessary level of hostile and abusive conduct to survive a motion for summary judgment.  She presents no

evidence that Boisot's conduct toward her was sexual in nature, nor does she allege that he ever touched her. Her allegations of inappropriate conduct must be analyzed under the Eleventh Circuit's rubric in *Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000):

> Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, the statements and conduct must be of a sexual or gender-related nature – "sexual advances, requests for sexual favors, [or] conduct of a sexual nature," – before they are considered in determining whether the severe or pervasive requirement is met. Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted. Title VII, as it has been aptly observed, is not a "general civility code."

*Gupta*, 212 F.3d at 583 (citations omitted) (alteration in original). The comments in this case about what Skelton was wearing, her age relative to her husband and co-workers, and which swimsuits would look good on various TCCC employees are not examples of "conduct of a sexual nature," nor of sexual advances by Boisot. His offhand comment that she would be interested in him if she were not married does not invoke Title VII's protections. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (citation omitted)).

Boisot's invitations for Skelton to visit his house are likewise not objectively sexual or gender-related in nature. Even his alleged remark that his wife would be working late,

without further evidence and considered along with Skelton's admission that Boisot never

propositioned her for sex, is much too vague to constitute more than speculation on Skelton's

part that Boisot invited her to his house for an improper purpose.  *See, e.g.*, *Mendoza v.*

*Borden, Inc.*, 195 F.3d 1238, 1256 (11th Cir. 1999) (Carnes, J., concurring) ("Title VII

requires a baseline of objectively offensive conduct, and that baseline cannot be met with

objectively ambiguous conduct that a suspicious employee subjectively perceives to be

improper.").  The invitations to travel to the electronic monitoring program provider's site

are clearly much more work-related than sexual, and Boisot's reference to "fun and games,"

in reference to a trip to the beach, is also insufficiently concrete as evidence that the

invitation was some sort of sexual proposition.  Again, Skelton's speculative perception that

objectively work-related conduct was in actuality sexual in nature is insufficient to create

liability under Title VII.  At worst, these incidences of alleged harassment constitute isolated

"offhand comments" that are not sufficiently serious to meet the *Faragher* standard cited

above.

In addition to the objective shortcomings of Skelton's allegations, there is evidence

that she subjectively did not believe that Boisot was sexually harassing her.  In her interview

with Lieutenant Waid, the following exchange took place:

> Lt. Waid:  [B]ack to the sexual harassment part.  What has [Boisot]
> done to you or said to you?
> C. Skelton:  Nothing.
> W:  Specifically.
> S:  Nothing.  Nothing, I would say.  I can't sit here and claim that he
> has said [unintelligible].

14

> W:  He hasn't said anything specifically?
> S:  I can't put my finger on anything.  Just innuendos. . . . [T]he only thing that I can remember him saying, and its [sic] just been recently, he said that if you weren't married you know you would be attracted to me.

(Doc. 62, Ex. B, ex. 2 at D00087.)  This testimony supports a finding that Skelton did not "subjectively perceive the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Skelton's claim for sexual harassment under Title VII, having failed both objective and subjective standards for sexual harassment, is due to be dismissed.

Skelton also brings a sexual harassment claim against both defendants under the Equal Protection Clause and 42 U.S.C. § 1983.  In this context, the elements of Skelton's sexual harassment claim under § 1983 are the same as those for her Title VII sexual harassment claim.  *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 n.4 (11th Cir. 2003) (quoting *Hardin v. Stinchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982) ("When section 1983 is used as a parallel remedy for violation of section 703 of Title VII the elements of the two causes of action are the same.")).  Therefore, because the elements are identical for claims asserting sexual discrimination in public employment regardless of whether the claims are asserted pursuant to Title VII or the Equal Protection Clause, this court's determination that Skelton has not submitted sufficient evidence to withstand defendants' Motions for Summary Judgment on her Title VII claim also determines that Skelton cannot prevail on her claim against defendants under § 1983.  Summary judgment on this claim is therefore due to be granted.

### 2.      Plaintiff Comenecia James

Defendant Tuscaloosa County argues that plaintiff Comenecia James's harassment claim under Title VII is time-barred.  (Defendant Tuscaloosa County's Mem. of Law in Supp. of its Mot. for Summ. J. ("TC's Br.") at 22.)  James concedes that she is time-barred from pursuing a claim under Title VII,[7] but not under 42 U.S.C. § 1983.  (Doc. 76 at 17.) Defendants do not argue that James's claim under § 1983 and the Equal Protection Clause is time-barred.  As was the case with Skelton, the elements for sexual harassment under Title VII will also apply to James's Equal Protection Clause claim.  *Snider*, 344 F.3d at 1328 n.4. Boisot's behavior toward James is distinguishable from his behavior towards Skelton in that he did have some physical contact with James, in addition to making allegedly harassing comments to her.  (Doc. 62, Ex. C at 36.)

The first instance of physical contact by Boisot occurred when James had returned from a visit to her doctor to determine the cause of fluid gathering on her knee.  (Doc. 62, Ex. C at 37-38.)  Boisot touched her knees for about five seconds, expressed concern for her, and discussed his own, similar knee problems.  (*Id.* at 38-40.)  He made no sexual comments

---

[7] A timely-filed Equal Employment Opportunity Commission ("EEOC") charge is a prerequisite to filing a complaint alleging a violation of Title VII.  "In order to be timely, the charge must have been filed within 180 days of the 'alleged unlawful employment practice.'" *Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir. 1992) (quoting 42 U.S.C. § 2000e-5(e)(1)).  James did not file her charge until August 20, 2003.  (Doc. 62, Ex. C, ex. 5 at 1.)  Her complaints of harassment involve alleged acts that took place before she transferred to the Northport office in September of 2002. (Doc. 62, Ex. C at 14, 50-51.)  These acts clearly would have occurred more than 180 days prior to August 20, 2003; therefore James's Title VII claim against Tuscaloosa County is due to be dismissed.

during this encounter (*Id.* at 42), and James testified that his touching was comparable to what a doctor would do and that she did not feel threatened (*Id.* at 147-49).  On an objective level, this touching is minimally, if at all, sexual in nature.  This behavior – examining someone's minor health problem and expressing concern – cannot be said to be physically threatening or humiliating, nor did it interfere with James's job performance.

James further alleges that Boisot harassed her by rubbing her shoulders on several occasions.  (Doc. 62, Ex. C at 43-45.)  This brief contact, which James likened to a massage, was always in response to James's complaints of fatigue and always accompanied by words of encouragement from Boisot about her job.[8]  (*Id.* at 43-44.)  Boisot did not say or do anything further to indicate to James that his touching was sexual in nature.  This reassurance by her supervisor also cannot reasonably be said to be severe, physically threatening or humiliating, nor did it interfere with James's job performance.

Likewise, Boisot's hug of James on her last day of work at the TCCC office, as described by James, is not sexual harassment.  James described this alleged form of sexual harassment at her deposition: "[Boisot] gave me a hug and told me how much he would miss

---

[8]  She described this form of alleged harassment at her deposition:

> [The shoulder rubbing] happened more than once or twice . . . [Boisot] would come in my office and . . . I would just say, "I'm so tired," or, "Today's been a long day at court," or something of that nature, and he would just tell me - he would just do my shoulders and say, "Com, you're doing a great job," "Job well done," "your courts are looking good," "The money's coming in," "I'm proud of you," things of that nature . . . .

(Doc. 62, Ex. C at 43.)

17

me, and call if I need anything, and he really was, you know, just showing his sympathy, he sa[id], of me leaving and going to Northport, how much he was going to miss me leaving the main office, and he gave me a hug . . . ." (*Id.* at 47-48.)  Taking James's testimony as true, no reasonable jury could find that Boisot's hug constituted gender-based harassment.

Boisot's touchings of James, like those in *Gupta* (in which the Eleventh Circuit reversed and remanded a jury verdict for a plaintiff alleging sexual harassment by her supervisor), were "only momentary" and not "coupled with any verbal suggestions or advances."  212 F.3d at 585.  This court refuses to label an appreciative hug on an employee's final day or an inspection of an injury as even arguably inappropriate; Boisot's physical interaction with James, if harassment at all, cannot reasonably be deemed to be severe or pervasive enough to survive summary judgment.

James also alleges that Boisot harassed her verbally on a number of occasions.  Some of the comments were similar to those he made to Skelton, such as complimenting her when she wore his favorite color, blue.  (*Id.* at 36.)  He also told James that she looked nice "on a regular basis" (*Id.* at 37), told her that she should not beat on her chest because her breasts were "too precious" (*Id.* at 51-52), and once asked her if she was "on the rag" (*Id.* at 58).  Additionally, Boisot asked her a number of questions about her personal life and her future plans for marriage and family.  (*Id.* at 36.)

For purposes of defendants' summary judgment motions, the court will assume that James can establish that she was subjected to unwelcome sexual harasssment when she was

18

told not to beat on her breasts and when she was asked if she was "on the rag."  However, Boisot's comments to James discussed above, even when considered collectively, were not sufficiently severe or pervasive for her to survive summary judgment on her Equal Protection Clause claim.

The severe or pervasive test "is the element that tests the mettle of most sexual harassment claims."  *Id.* at 583.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – " cannot create liability.  *Harris*, 510 U.S. at 21.  The Eleventh Circuit has set forth four primary factors that should be considered in determining whether harassment is sufficiently severe or pervasive to objectively alter the terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Mendoza*, 195 F.3d at 1246; *see also Harris*, 510 U.S. at 23.

"It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.  Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory."  *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999) (cited with approval in *Gupta*, 212 F.3d at 585).  Boisot's comments ranged from awkward or overly-

19

familiar conversation to compliments on plaintiffs' appearances;[9] these comments were not overtly (and in many cases, not at all) sexual in nature.

The relevant facts from other case law supports the court's finding that any harassment James suffered was neither severe nor pervasive. *See Gupta*, 212 F.3d 571 (finding a plaintiff's allegations that her supervisor asked her to lunch many times, once told her she looked "very beautiful," and once placed his hand on her knee were not sufficiently severe or pervasive to be actionable); *Mendoza*, 195 F.3d 1238 (holding that conduct did not rise to an actionable level when the alleged harassment consisted of supervisor "constantly" watching the plaintiff and following her in the workplace, looking her "up and down" on two or three occasions while making a sniffing sound, rubbing his hip against her hip while touching her shoulder as she walked by on one occasion, and once telling her he was getting "fired up" when she entered his office); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430

---

[9]  In *Gupta*, the Eleventh Circuit considered whether a supervisor's compliments on his female subordinate's appearance constituted harassment:

> It is debatable whether such a compliment is sexual in nature, but assuming that it is, we do not believe that a reasonable person would deem it to be offensive. A man can compliment a woman's looks . . . on one or several occasions, by telling her that she is looking "very beautiful," or words to that effect, without fear of being found guilty of sexual harassment for having done so. Words complimenting appearance may merely state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment. *See Oncale* [*v. Sundowner Offshore Servs., Inc.*], 523 U.S. [75,] 81 [1998] (explaining that intersexual flirtation is part of ordinary socializing in the workplace and should not be mistaken for discriminatory "conditions of employment").

212 F.3d at 584.

(7th Cir. 1995) (reversing a jury verdict for the plaintiff where the evidence reflected that her direct supervisor would call her "pretty girl," once grunted when she wore a leather skirt, said that her entering his office was what made the office hot, said that a request for attention over the public-address system meant "all pretty girls run around naked," and made a motion suggesting masturbation after referring to having only a pillow for company in his hotel room); *Garcia v. ANR Freight System*, 942 F. Supp. 351 (N.D. Ohio 1996) (granting summary judgment for employer despite claims that manager conducting the plaintiff's orientation grabbed the back of plaintiff's head and guided it toward his lap; asked to spend the night in her hotel room, and brushed his hand against plaintiff's breast). The conduct in these cases was much more sexual in nature, severe, and pervasive than that complained of in the present case.

Sexual harassment plaintiffs must meet a critical threshold of severity to proceed beyond summary judgment. Because the conduct in this case was significantly less sexual in nature, less severe, and less pervasive than the conduct at issue in the cited cases, plaintiffs' sexual harassment claims will be dismissed.

### 3. Plaintiffs' § 1983 Claims Against Tuscaloosa County

Because the court has found that defendant Boisot is entitled to summary judgment on plaintiffs' sexual harassment claims under the Equal Protection Clause and § 1983, defendant Tuscaloosa County's motion for summary judgment on these claims is obviously also due to be granted. However, even if plaintiffs could show that Boisot's actions

constituted sexual harassment, plaintiffs' § 1983 claims against Tuscaloosa County would still be due to be dismissed.

The law is well-established that the County cannot be held liable for Boisot's conduct on the basis of *respondeat superior*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978). However, a local government[10] may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury." *Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005) (citing *Monell*, 436 U.S. at 694).

Plaintiffs have not presented evidence that a Tuscaloosa County policy or custom of harassment was responsible for their claims. Without such evidence, "[a] county does not incur § 1983 liability for injuries caused solely by its employees." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *Monell*, 436 U.S. at 694). As a result, Tuscaloosa County cannot be held liable for Boisot's conduct. Plaintiffs' § 1983 claims against Tuscaloosa County will be dismissed.

## B.    Plaintiffs' Retaliation Claims

Plaintiffs assert claims against both defendants for retaliation under Title VII and the Equal Protection Clause in concert with § 1983. (Doc. 1 ¶¶ 52-55.) Because Boisot is not

_____

[10] Plaintiffs suggest that the doctrine espoused in *Monell* may not apply to *county* governments, but rather only to municipal governments. (Doc. 76 at 17.) In this context, the Eleventh Circuit has applied *Monell*'s holding to county governments on several occasions. *See, e.g.*, *Turquitt v. Jefferson County*, 137 F.3d 1285, 1292 (11th Cir. 1998); *Gattis v. Bruce*, 136 F.3d 724, 725 (11th Cir. 1998); *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996).

an employer tor Title VII purposes, 42 U.S.C. § 2000e(b), the retaliation claim against him

may proceed only under § 1983.

1.      **Plaintiffs' Retaliation Claims Against Defendant Boisot**

Plaintiffs' § 1983 retaliation claims against Boisot are not actionable.  The Eleventh

Circuit has collected the relevant case law:

> A pure or generic retaliation claim, however, simply does not implicate
> the Equal Protection Clause.  *See Ratliff v. DeKalb County*, 62 F.3d
> 338, 340 (11th Cir. 1995) (reversing denial of qualified immunity on
> equal protection retaliation claim because "[t]he right to be free from
> retaliation [for *making complaints of discrimination*] is clearly
> established as a *first amendment* right and as a *statutory* right under
> Title VII; but no clearly established right exists under the *equal
> protection* clause to be free from retaliation"); *Grossbaum v.
> Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th
> Cir. 1996) (Equal Protection Clause "does not establish a general right
> to be free from retaliation"); *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir.
> 1996) ("[W]e know of no court that has recognized a claim under the
> equal protection clause for retaliation following complaints of racial
> discrimination."); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989)
> ("Gray's right to be free from retaliation for protesting sexual
> harassment and sex discrimination is a right created by Title VII, not
> the equal protection clause.") . . . .

*Watkins v. Bowden*, 105 F.3d 1344, 1354-55 (11th Cir. 1997) (alterations and emphases in

original).  Because § 1983 does not establish a basis for plaintiffs' retaliation claims against

Boisot, those claims are due to be dismissed as a matter of law.

2.      **Plaintiffs' Retaliation Claims Against Defendant Tuscaloosa County**

Tuscaloosa County argues that plaintiffs cannot establish a prima facie case for their

retaliation claims against it under Title VII.  Specifically, the county argues that plaintiffs

cannot show that they suffered any adverse employment action as a result of their complaints about Boisot.  (TC's Br. at 25.)

To establish a prima facie case of retaliation under Title VII, plaintiffs must show that "(1) [they] engaged in protected activity, (2) [they] suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action."  *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004).  The *Stavropoulos* court further explained the second element:

> To be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must either be an ultimate employment decision or else must "meet some threshold level of substantiality." [*Bass v. Bd. of County Comm'rs*, 256 F. 3d 1085, 1118 (11th Cir. 2001)] (internal quotations omitted).  Ultimate employment decisions include decisions such as termination, failure to hire, or demotion.

*Stavropoulos*, 361 F.3d at 616-17.  Plaintiffs argue that Boisot intended to transfer both of them in retaliation for their complaints, and the fact "that he subsequently rescinded the announced transfers does not change the existence of a factual dispute as to his motives." (Doc. 76 at 19.)

Regardless of whether an actual transfer would have been an adverse action, Boisot's *intended* transfers of plaintiffs are clearly not retaliatory actions for purposes of Title VII. The Eleventh Circuit has stated that "an action which, it turns out, had no effect on an employee is not an 'adverse' action."  *Gupta*, 212 F.3d at 588.  Two days after Boisot

24

announced the transfers, he rescinded them.  (Doc. 62, Ex. B, exs. 4-5.)  The original transfer order had "no effect" on plaintiffs and therefore no adverse action arose from it.

Plaintiffs also allege that Boisot retaliated against them by instituting a lawsuit against them for defamation.  (Doc. 76 at 19.)  Even if plaintiffs could show that Tuscaloosa County directed or was in some way responsible for this action, they could not show that the filing of a personal lawsuit was an "adverse *employment* action."  The lawsuit had no effect on plaintiffs' status as employees.  Because plaintiffs suffered no adverse employment actions, Tuscaloosa County is entitled to summary judgment on their retaliation claims.

**C.**   **Plaintiffs' Tort Claims Against Boisot**

**1.**   **Invasion of Privacy**

Plaintiffs claim that Boisot's conduct towards them violated their rights to privacy under Alabama law, causing them to suffer mental anguish, emotional distress, and embarrassment, for which they now seek compensatory and punitive damages.  (Doc. 1 ¶¶ 65-66.)  Alabama law recognizes four types of invasion of privacy: "1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use."  *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 708 (Ala. 1983).  It is the first type of invasion that is alleged by plaintiffs here.

Plaintiffs cite *Phillips* for the proposition that "[u]nwanted touching has long been considered an invasion of a person's right to physical solitude or seclusion in Alabama." (Doc. 76 at 21.)  From this proposition, it would follow, James's allegations of numerous touchings by Boisot would render summary judgment on James's invasion of privacy claim improper.  (*Id.*)  However, plaintiffs overstate the holding in *Phillips*, and the facts of that case are distinguishable from the facts in this case.

In *Phillips*, the Eleventh Circuit certified the following question to the Supreme Court of Alabama:

> Does the law of the State of Alabama recognize the tort of invasion of privacy in the form described in § 652B, *Restatement (Second) of Torts* (1977) and set forth below?
>
> "One who intentionally intrudes physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

*Phillips*, 435 So. 2d at 706.  The supreme court answered this question in the affirmative, *id.* at 709, and went on to take notice of a comment to the Restatement that clarifies the scope of this tort:

> The invasion may be physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home.  It may also be use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs window with binoculars or tapping his telephone wires.  It may be by some *other form* of investigation or *examination* into his private concerns . . . .

26

*Id.* at 710-11 (quoting RESTATEMENT (SECOND) OF TORTS § 652B cmt. b).  The objected-to
conduct in *Phillips* included the defendant supervisor's frequent and detailed questions about
an employee's sex life with her husband; repeated demands by him that she perform sexual
favors or lose her job; and the employee eventually being effectively terminated.  *Id.* at 707.
Applying these principles, the Alabama court found that the supervisor's "intrusive and
coercive sexual demands upon [the plaintiff] were such an 'examination' into her 'private
concerns.'" *Id.* at 711.  The court then found that, on the facts of that particular case,[11] it had
"no hesitancy in expressing [its] conclusion that these facts meet all the requisite elements
contemplated by" the Restatement.  *Id.*

The law discussed in *Phillips*, when applied to the facts of the present case, does not
yield the same result.  Under the Restatement definition, whether or not Boisot's infrequent
touchings of James constitute "intru[sion] physically or otherwise, upon the solitude or

---

[11] The supervisor in the *Phillips* case treated the plaintiff in that case much more harshly than Boisot
treated plaintiffs in the present case.  As the Alabama Supreme Court noted:

> During Plaintiff's tenure with Defendants, she was subjected to intrusive
> demands and threats, including an inquiry as to the nature of sex between her
> and her husband.  According to testimony, such incidents were occurring two
> or three times each week.  Additionally, we note from Plaintiff's testimony
> of record the repulsive manner in which Smalley's solicitations were made.
> On one occasion, he struck her across the buttocks with his hand.  On still
> another occasion, he began papering his office window, thus obscuring the
> view of those in the surrounding area, in pursuit of what he hoped would be
> the consummation of lurid propositions to Plaintiff.  Smalley, aware of the
> importance to Plaintiff of her regular income, rendered her, in effect, an
> "economic prisoner."

435 So. 2d at 711.

seclusion of [James's] affairs or concerns," the court finds that it cannot reasonably be said that these touchings would be "highly offensive to a reasonable person." RESTATEMENT (SECOND) OF TORTS § 652B.  James testified that Boisot touched her knees in a manner similar to a medical exam (Doc. 62, Ex. C at 147-48); massaged her shoulders, while making work-related comments, in response to her complaints of stress and fatigue (*Id.* at 43-44); and hugged her on her final day in the office and told her she would be missed (*Id.* at 49).  These touchings are not objectively sexually suggestive and cannot reasonably said to be "highly offensive."

Skelton alleges that her privacy was violated by "Boisot's leering at [her], coupled with his comments about her choice of a husband and his remarks that she would be interested in him." (Doc. 76 at 21.)  Similarly, James complains that Boisot's comments to her about her appearance and, particularly, her breasts, had the same effect.  (*Id.*)  Plaintiffs assert that Boisot may be held liable for invasion of privacy for these comments under *Hogin v. Cottingham*, 533 So. 2d 525 (Ala. 1988), in which, plaintiffs claim, "the Court required only that 'there must be something in the nature of prying or intrusion which would be offensive or objectionable to a reasonable person.'" (Doc. 76 at 21 (quoting *Hogin*, 533 So. 2d at 531).)  However, "[t]he thing into which there is intrusion or prying must be, and be entitled to be, private." *Hogin*, 533 So. 2d at 531 (quoting W. Prosser and W. Keeton, THE LAW OF TORTS 855 (5th ed. 1984)).  The relevant standard is whether there has been a "wrongful intrusion into one's private activities in such manner so as to outrage or to cause

mental suffering, shame or humiliation to a person of ordinary sensibilities." *Id.* at 530

(quoting *Smith v. Doss*, 37 So. 2d 118, 120 (Ala. 1948)).

Some of Boisot's comments and questions about plaintiffs' personal lives may have

been more intimate than a supervisor's normal small talk with his employees, but it cannot

reasonably said that Boisot intruded on "private" topics and activities. Skelton acknowledges

that she voluntarily talked with Boisot about her future husband and the possibility of

marriage (Doc. 62, Ex. B at 209-10), so she cannot claim an expectation of privacy regarding

that matter. *See Hogin*, 533 So. 2d at 531 ("The thing into which there is intrusion or prying

must be, and be entitled to be, private."). Similarly, James often discussed her family life

with her co-workers. (Doc. 62, Ex. C at 138-44.) When Boisot asked her comparable

questions, she requested that he stop, and no further questions on this topic were asked. (*Id.*

at 145.) Plaintiffs' allegations fall short of that required to constitute invasion of privacy and

are due to be dismissed.[12]

### 2.    James's Assault and Battery Claim

James asserts that Boisot's touchings of her constituted assault and battery under

Alabama law. (Doc. 1 ¶¶ 67-69.) To succeed on such a claim, a plaintiff must establish "(1)

---

[12]   Even if the court had found Boisot's comments to have intruded on private topics, plaintiffs'
invasion of privacy claims would still be dismissed. The behavior alleged could not reasonably be
said to rise to such a level "so as to outrage or to cause mental suffering, shame or humiliation to a
person of ordinary sensibilities." *Hogin*, 533 So. 2d at 530 (quoting *Smith*, 37 So. 2d at 120); *see
also McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649 (Ala. 1986) (holding that a male employer's
requests for a female worker to have dinner with him, to kiss him, and to have an affair with him fell
short of that required to constitute a claim for invasion of privacy).

that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998).  It is the third prong of this test that is at issue here.

James cites a case from the Alabama Court of Criminal Appeals for the proposition that "if a man takes improper liberties with the person of a female, or indecently fondles her without her consent, he is guilty of an assault and battery." (Doc. 76 at 21-22 (citing *Bennett v. State*, 329 So. 2d 627, 629 (Ala. Crim. App. 1976).)  Terming Boisot's actions "uninvited and unwelcome conduct of a sexual nature," James argues that the holding in *Bennett* mandates a finding that she has satisfied, for summary judgment purposes, the third element of the test.  (*Id.* at 22.)

This argument fails.  Generally speaking, the court has already concluded *supra* that Boisot's conduct was not sufficiently objectively offensive to allow plaintiffs' sexual harassment and invasion of privacy claims to survive summary judgment.  The occasions on which Boisot touched James include a quasi-medical examination of her injured knee, his briefly rubbing her shoulders in response to her work-related complaints while commending her on her job performance, and a brief hug to wish her well when she moved to another office.  It follows from these facts, as well as the court's previous findings, that Boisot's touchings were not offensive for assault and battery purposes.

On a more specific level, plaintiffs have failed to establish that Boisot's conduct constituted assault and battery under relevant Alabama case law.  The *Bennett* case involved a thirty-five year old male bus driver and a mentally disabled sixteen year old girl.  329 So. 2d at 628.  The man had occasionally seen the girl walking while he was driving a bus, and upon seeing her while in his car he offered to give her a ride home.  *Id.*  After she got into the car he pulled her toward him, kissed her numerous times, and "put his hands on her."  *Id.* The bus driver told the girl not to tell her parents about his conduct before he let her go.  *Id*. Those facts are significantly more offensive than the facts of this case as described above.

The two cases cited by the *Bennett* court that deal with assault and battery by a male against a female are *Walker v. State*, 31 So. 557 (Ala. 1902), a case decided more than a century ago in which the entire decision consists of this one sentiment without supporting or elaborating facts, and *Moore v. State*, 31 So. 2d 373 (Ala. App. 1947), a case overturning a guilty verdict on evidentiary grounds.  *Moore* cites two Alabama cases concerning valid assault and battery claims, both of which dealt with adult males inappropriately touching preteen girls.  31 So. 2d at 374 (citing *Austin v. State*, 21 So. 2d 126 (Ala. App. 1945) and *Thomas v. State*, 96 So. 182 (Ala. App. 1923)).  Nothing in this slim case law supports James's claim that Boisot's behavior constituted assault and battery.  Because she has failed to establish the minimum prerequisites to a claim for assault and battery, that claim is due to be dismissed.

31

### 3.      Plaintiffs' Outrageous Conduct Claims

Plaintiffs concede that these claims are due to be dismissed.  (Doc. 76 at 22.)

### 4.      Plaintiffs' Abuse of Process Claims

Plaintiffs assert that Boisot filed a "frivolous and meritless defamation case" against

them which caused "mental anguish, emotional distress and embarrassment." (Doc. 1 ¶¶ 76-

77.)  To establish a claim for abuse of process, plaintiffs must establish "(1) the existence of

an ulterior purpose; 2) a wrongful use of process, and 3) malice."  *Willis v. Parker*, 814 So.

2d 857 (Ala. 2001).

Plaintiffs' abuse of process claims are without merit.  "[A]buse of process concerns

the wrongful *use* of process *after it has been issued*."  *C.C. & J., Inc. v. Hagood*, 711 So. 2d

947, 950 (Ala. 1998).  Where the proceeding is dismissed, as with the dismissal without

prejudice of Boisot's claims (Doc. 25), no abuse of process can be found, regardless of

defendant's intent:

> *[The defendant] is not liable for abuse of process simply because it*
> *prosecuted [the plaintiff] with an ulterior purpose. . . .  Merely*
> *proceeding with a . . . complaint and later agreeing to dismiss the*
> *charge cannot constitute a wrongful use* because:  "'[T]here is no
> *liability where the defendant has done nothing other than carry out the*
> *process to its authorized conclusion, even though with bad intentions*.
> . . .  [I]t is what is done in the course of negotiation, rather than the
> issuance or any formal use of process itself, which constitutes the tort.'
> ". . .  [The defendant] cannot be liable for an abuse of process claim
> *unless [he] somehow acted outside the boundaries of legitimate*
> *procedure after the charge had been filed*."

32

*Willis*, 814 So. 2d at 865-66 (citing *C.C. & J.*, 711 So. 2d at 950-52) (alterations and emphases in *Willis*).

Boisot's filing of a defamation charge and its ultimate dismissal without prejudice were well within the valid legal process.  These claims are due to be dismissed.

**D.     Plaintiffs' Negligence Claims Against Tuscaloosa County**

**1.     Common Law Negligence**

Plaintiffs bring claims under Alabama law against defendant Tuscaloosa County for common law negligence.  (Doc. 1 ¶¶ 56-58.)  Plaintiffs argue in support of these claims that the county, as an employer, has a duty to provide its employees a work environment that is free of sexual harassment and gender discrimination.  (Doc. 76 at 20.)  They further argue that, "[b]y taking no action in the face of massive evidence against Boisot, the County has ratified his conduct."  (*Id.*)

"The elements of a negligence claim are a duty, a breach of that duty, causation, and damage."  *Armstrong Bus. Svcs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001). Plaintiffs' complaint alleges Tuscaloosa County breached its duties to enforce its non-harassment policies and to take appropriate action in response to any harassment.  Clearly, these duties only become relevant if some actual harassment has occurred.  Because the court has found that Boisot did not commit any actionable sexual harassment, the negligence claims fail for a lack of any breach of duty, and therefore are due to be dismissed.

### 2.      Negligent Supervision and Retention

Plaintiffs assert that "the County knew, or should have known, of Boisot's propensity to engage in unlawful and inappropriate conduct . . . but failed to take any steps reasonably designed to prevent his conduct."  To state such a claim, "plaintiffs must establish that the allegedly incompetent employee committed a common-law, Alabama tort." *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) (citing *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999)).  As the court has concluded, plaintiffs cannot establish that Boisot committed any tort under Alabama law.  Therefore, these claims are due to be dismissed.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the court is of the opinion that defendants' Motions for Summary Judgment are due to be granted.  An Order granting defendants' Motions for Summary Judgment will entered contemporaneously with this Opinion.

**DONE** this the 12th day of August, 2005.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE

34